961 F.2d 1580
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Joseph Lamont ROBINSON, Defendant-Appellant.
 No. 91-5180.
 United States Court of Appeals, Sixth Circuit.
 April 28, 1992.
 
 Before KEITH and SILER, Circuit Judges, and WELLFORD, Senior Circuit Judge.
 PER CURIAM.
 
 
 1
 Defendant, Joseph Lamont ("Monty") Robinson, appeals the district court's two-level enhancement of his sentence pursuant to United States Sentencing Guidelines § 3B1.1(c). On April 10, 1990, defendant was indicted on four counts for distributing crack cocaine in violation of 21 U.S.C. § 841(a)(1).[1] On August 1, 1990, defendant pleaded guilty to count one. Pursuant to Section 2D1.1, defendant's base offense level ("BOL") was 30. His BOL was increased two levels under Section 3B1.1(c)[2] for defendant's role as an organizer, leader, manager, or supervisor.[3] The defendant's BOL was decreased two levels for acceptance of responsibility. Therefore, the offense level total ("OLT") contained in the presentence report was 30.
 
 
 2
 Due to the defendant's eleven prior arrests, his criminal history category was III. His OLT and criminal history resulted in a sentencing range of 121-151 months, and he was sentenced to 118 months in prison.[4] For the following reasons, we AFFIRM the defendant's sentence.
 
 I.
 
 3
 In December, 1989 or January, 1990, Victor Leftwich, a crack cocaine addict, began cooperating with Chattanooga, Tennessee, police officers, particularly Agent Terry Thomas. During this time period, Leftwich met with Cary Robinson ("Robinson") and Donny Moore in an Alton Park residence to arrange a purchase of crack. The men informed Leftwich that the deal could not take place because "Monty [is] gone...."
 
 
 4
 Subsequently, Leftwich returned to the Alton Park residence to arrange another drug purchase. The defendant entered the kitchen, where Moore and Robinson were supplying drugs to Leftwich and other drug purchasers. The defendant began supplying the purchasers himself, because he was upset with the speed at which the service was proceeding. Later that same month, Leftwich returned to the residence and was told to wait, because the drugs were not yet available. The defendant arrived in about fifteen minutes carrying three boxes of baking soda.[5] Leftwich entered the house about thirty minutes later and made his purchase.
 
 
 5
 On February 16, 1990, Leftwich and Thomas returned to the Alton Park residence and were met by Wesley Lebron Barnes. After taking Leftwich's order, Barnes walked to the residence. Leftwich and Thomas saw the defendant approaching the vehicle. Leftwich asked the defendant about purchasing some cocaine, but the defendant was concerned that Thomas might be a police officer. The defendant returned to the residence and, shortly thereafter, Barnes departed with 1.5 grams of crack, which he sold to Leftwich. Barnes stated that the crack was "Monty's dope."
 
 
 6
 On February 20, 1990, Leftwich met the defendant at a second house, located on Fourteenth Street, and purchased 14.3 grams of crack from him. On February 21, 1990, Leftwich again met the defendant at the Fourteenth Street location to purchase crack. However, the defendant believed Leftwich was wired. To prevent detection, Leftwich stated that he was not personally carrying all the money for the purchase and returned to the vehicle to discard the wire. Upon Leftwich's return, the defendant instructed another dealer to complete the transaction, which was consummated.
 
 
 7
 On March 5, 1990, Leftwich returned to the Fourteenth Street house, where the defendant and Moore met him. The defendant told Leftwich to drive around the block. Upon returning from his second trip around the block, Moore sold Leftwich some cocaine. Moore then counted the money in the defendant's presence.
 
 
 8
 On March 10, 1990, John Carter, a police undercover officer, visited the Fourteenth Street house, where he was met by the defendant and James Colepenny. Carter negotiated a cocaine purchase with the defendant. The defendant left in a Camero and returned with a white plastic bag. After speaking briefly with Colepenny, the defendant instructed Colepenny to execute the transaction, which Colepenny did.
 
 
 9
 On March 13, 1990, Carter again visited the house to purchase cocaine, where he was met by the defendant and Alex Brown. The defendant left to retrieve the cocaine. While he was gone, Carter told Brown that he would need nine ounces of cocaine eventually. Brown assured Carter that he and the defendant could handle whatever quantity he needed. Upon returning, the defendant told Carter to go to the back of the house and give Brown the money. Shortly after this exchange, another individual named Arnold gave Brown the cocaine, which Brown transferred to Carter.
 
 
 10
 On April 13, 1990, another drug transaction took place. Carter met Marvin Goodman at a gas station. Goodman stated that the defendant wanted the money given to Goodman. Carter was reluctant to do so, but the defendant assured Carter that the money would be returned if the deal was not completed. Subsequently, Carter and the defendant traveled to a night club to wait for the drugs. Henry Ford, the defendant's supplier, soon arrived at the club, whereupon the defendant instructed Carter to go to the Fourteenth Street house. Carter and Warren Herbert, the defendant's associate, journeyed to the residence together. Primo Moore, another associate of appellant, delivered the cocaine to Herbert, who in turn transferred it to Carter.
 
 II.
 
 11
 On November 1, 1990, the Introductory Commentary to Section 3B1 was amended to state that the role in offense adjustment should be based on all relevant conduct. The defendant was sentenced on November 16, 1990. The amendment may be considered as evidence of the Commission's intent. See United States v. Mir, 919 F.2d 940, 945 (5th Cir.1990) (The November 1, 1990, amendment was not intended to change the law, see Fed.Reg. 19,202 (1990), but rather clarifies the law.).[4] The amendment evinces the Commission's pre-amendment intent that all conduct within the scope of Section 1B1.3 be considered in determining a defendant's role in an offense.
 
 
 12
 Although prior Fifth Circuit cases hold that an upward adjustment for a leadership role must be grounded in the defendant's transaction, the Mir court clarified what constitutes the "transaction" under old Fifth Circuit law. The Mir court stated that "[i]t is not the contours of the offense charged that defines the outer limits of the transaction; rather, it is the contours of the underlying scheme itself." Mir, 919 F.2d at 945.
 
 
 13
 We, like the Mir court, hold that the contours of the underlying scheme defines the transaction's outer limits. The defendant was more than a casual player in the underlying scheme. Others involved in the scheme immediately performed criminal activities at the defendant's request. The defendant negotiated many of the drug transactions. Moreover, the evidence indicated that the defendant, like Mir, orchestrated his own supply network. The buyers looked to the defendant, not the tangential participants, for assurance that the deals would be consummated. Accordingly, a preponderance of the evidence, see United States v. Miller, 910 F.2d 1321, 1328 (6th Cir.1990), cert. denied, --- U.S. ----, 111 S.Ct. 980 (1991), supports the district court's finding that the defendant was a leader in the criminal enterprise. For the foregoing reasons, the judgment of the district court is
 
 
 14
 AFFIRMED.
 
 
 
 [1]
 The four counts were based on criminal activities occurring on February 20, 1990, February 21, 1990, March 1, 1990, and March 5, 1990
 
 
 [2]
 Section 3B1.1 ("Aggravating Role") provides:
 Based on the defendant's role in the offense, increase the offense level as follows:
 * * *
 (c) If the defendant was an organizer, leader manager, or supervisor in any criminal activity.... increase by 2 levels.
 
 
 [3]
 The defendant contends that the February 16, March 5, and March 10 transactions, discussed herein, are insufficient to establish that he was a leader or organizer
 
 
 [4]
 The district judge chose the minimum within the sentencing range (121 months) and decreased it by 3 months pursuant to section 5K1.1 of the Guidelines
 
 
 [5]
 Baking soda is used to convert powdered cocaine to crack cocaine. The conversion process lasts about fifteen to twenty minutes
 
 
 [6]
 The scope of Section 1B1.3 applies to Chapter Three adjustments unless otherwise specified. Section 1B1.3(a). When a limited scope of criminal conduct is intended, the Guidelines use the terms "convicted of" or "offense of conviction." United States v. Fells, 920 F.2d 1179, 1184 (4th Cir.1990), cert. denied, --- U.S. ----, 111 S.Ct. 2831 (1991). The Commission's failure to use these limiting terms indicates an intent that all relevant conduct be considered